Indictment under the statute for stealing a slave. The three first counts in the bill charged that the slave was the property of on Phillip G. Smith, and the fourth the property of on James White and James Brown. Defendant pleaded not guilty, and upon the trial at the present term of the court of the solicitor called one Phillip G. Smith, the alleged owner of the slave, as a witness in behalf of the State, who testified that the slave Lewis ran away from his plantation in Anson County in October, 1850, and was not seen by him until he was taken out of jail in Tazewell County, Va., in May, 1851; that the negro belonged to him, and was brought back to this State.
James White, a witness for the State, swore that on 1 January last he and one James Brown arrested the slave Lewis in Guilford County and were making arrangements to carry him to jail in Greensboro as a runaway slave, when the prisoner passed by the house where they were, with his wagon. He asked some questions of the slave, and had a conversation with him and Brown. The latter stated to the (64) prisoner that they had no vehicle to carry the negro to jail in, and proposed to him to carry him in his wagon. After some further conversation the prisoner agreed to do so for the sum of $1.50, provided the witness and Brown would meet him on the road to Greensboro at the house of one Bowman, while he, the prisoner, should go by his residence and discharge the load which he then had in his wagon. After this the witness and Brown proceeded with the slave to the house of Bowman, and soon thereafter the prisoner drove up with his wagon, and went and hundred yards beyond the house before her stopped; that the witness carried the negro out, and the four proceeded on their way in the direction of Greensboro. No one at Bowman's saw the prisoner, it then being dark, and his wagon was stopped beyond the house. About a mile from the house of one Pegg on the road the prisoner made a proposition to turn back with the slave and keep him until a reward should be offered, and also said his horse was worried and the weather very cold. The witness and Brown opposed this proposition. The prisoner proposed to stop at Pegg's as they passed to get some liquor. As they approached the house he sent the witness and Brown in with a ten-dollar bill, which he gave them to buy liquor, and he drove on *Page 58 
about 75 yards beyond the house with the wagon before he stopped. It was still dark, and the witness and Brown bought the liquor and followed on after the prisoner. When they overtook him in the road, and they all drank together, the prisoner again complained of the cold and said his horse was too much fatigued to proceed. He also proposed to take the negro and keep him for a few days in a vacant house of his, in order to give time for a reward to be offered; said he would take the papers and would see when the reward was offered, and (65) would then proceed to jail with him; that by waiting a while they might secure the reward, and he also said it would not do to let anyone see the slave in his possession, as it was against the law. The witness and Brown objected to this course at first, but subsequently assented. It was agreed that the prisoner should keep the slave until the weather changed and a reward should be offered. They all then went back to a vacant house, about a quarter of a mile from the residence of the prisoner, where they remained during the night with the slave. The next morning the witness and Brown returned to their homes, leaving the slave in the old house with the prisoner. On Saturday following the witness returned and asked the prisoner if he had carried the negro to jail. He replied that he had not; that no one knew where the slave was except himself and another; that he could go to him then, and expected to do so again, and would shoot anyone whom he should discover watching him. He said they could only have gotten $5 by carrying the negro to jail. A few days after this the witness again saw the prisoner, who said that one Abram Weaver had taken the negro off where no one could get him. Subsequently the witness Brown and the prisoner were arrested under a charge of stealing the slave, and while in the jail together at Greensboro the two first told the prisoner that if he had taken the negro on to jail as agreed upon, they would not have been where they then were. To which he replied by requesting them to stock to what they had said, and should they all be convicted, he would come out and exculpate the witness and Brown, and take all upon himself.
Upon cross-examination, the witness said that he had heretofore made a different statement in his petition for a habeas corpus, and to various other persons; that on the night of 1 January, as they returned, he told Brown that the slave had escaped as they were carrying him to (66) jail. This statement he said was made to several persons in pursuance of an understanding with the prisoner when they turned back with the slave. The witness was told that he would be released and made a witness against the prisoner if he would come out and tell all about the matter. *Page 59 
James Brown was next called by the State, who gave the same account of the arrest of the slave as the witness White, together with the contract with the prisoner to carry him to jail, their progress on the road to Greensboro, and turning back at the instance of the prisoner, with the other incidents spoken of by the witness. He saw the prisoner a few days after, and threatened to make the circumstances connected with the slave public. The prisoner said if he did that the witness and White would be punished, as they alone had been seen with the slave. He also said that no one knew where the slave was except himself and another. After this time he said that one Abram Weaver had come and taken the slave off with him.
Other evidence was given tending to show a conspiracy between Weaver and the prisoner.
Counsel for the State proposed to give in evidence the declarations of Weaver to a witness as to the manner of his getting the negro from the prisoner and carrying him to Virginia at the request and as the agent of the prisoner. These declarations were objected to by prisoner's counsel:first, upon the ground that no conspiracy had been shown between Weaver and the prisoner; and, secondly, because in no event would the declarations after the transaction, in the absence of the prisoner, and merely reciting the occurrences, be admissible against the prisoner. The court was of opinion that the acts and declarations of Weaver were admissible as confirmatory of the witnesses (67) White and Brown so far as they tended to prove a conspiracy between Weaver and the prisoner. And thereupon the witness swore that Weaver told him that he had gotten the negro from the prisoner and taken him over to Virginia as his agent.
Mr. Hamlet, for the State, swore to the same purport.
The court charged the jury, among other things, that if the prisoner received the negro from White and Brown under the pretense of carrying him to jail, but with the intention at the time of stealing him, and in this manner got possession of the slave and carried him off, he would be guilty as charged in the fourth count in the bill for taking from White and Brown, provided they should be of opinion that they had arrested him as a runaway slave and were in the act of carrying him to jail in good faith; that such a possession would constitute a sufficient property in White and Brown to the slave to sustain the charges in the fourth count in the bill; that such a property in them was not inconsistent with a general property in Smith at the same time; that if they all had the negro in possession, with the honest intention of carrying him to jail, and concluded to turn back and keep him till a reward should be offered, they would thereby lose the control which the law gave to them over the slave as a runaway so soon as they started back *Page 60 
with this intention; and the possession would at once rest exclusively in Smith, the general owner, and a subsequent taking from the old house would be a taking from Smith, should they believe that he was really the owner. Prisoner's counsel moved the court to instruct the jury that when White and Brown took up the slave as a runaway, the act was lawful, and they had a special property in him, to the extent of the reward given by law; and if they committed him to the custody of the prisoner for safe keeping until the weather should get better, (68) the carrying him away by the prisoner was not a larceny, but simply a breach of trust, as no larceny could be committed without a trespass.
The court expressed the opinion that this would be the law under the supposed state of facts, but that the evidence was that the object in keeping the slave away from jail was to wait until a reward should be offered, in addition to the reason concerning the weather, and that this would be such a breach of trust as would vest the property in the general owner. The jury returned a verdict of guilty on the fourth count in the bill, and not guilty on the first three. Prisoner's counsel moved for a new trial: first, because the evidence would not sustain the verdict; second
and third, for misdirection and admission of improper testimony. The rule was allowed, and subsequently discharged, the court being of opinion that the declarations of Weaver tended to show a conspiracy between him and the prisoner to take the negro from the State and sell him. A conspiracy being the assent of two minds or more to do an unlawful act together, the admission of each one, separately, to that effect would be evidence of the combination of all; and such a conspiracy, when established, would tend to corroborate the two witnesses, White and Brown, and to characterize the previous acts of the prisoner. That though they had been admitted but for the former purpose, it was a restriction favorable to the prisoner. Judgment was then rendered against the prisoner, and he appealed. There was a verdict of guilty.
There was evidence tending to show that the prisoner had stolen the slave, and had procured on Weaver to take him to Virginia, and sell him, in 1851. The slave was a runaway and had been arrested by one White and on Brown, and they were the witnesses mainly relied on by the State to make out the case. A witness called by the State swore that in April, 1851, he went to Virginia in search of the slave; found him in the possession of one Lowder, to whom he had been sold by Weaver; committed the slave to jail and caused *Page 61 
Weaver to be arrested on a charge of negro-stealing. The State then offered to prove by this witness that, after his arrest, Weaver told the witness that he had got the slave from the prisoner and had taken him over to Virginia and sold him as his agent. This evidence was objected to on the part of the prisoner, "first, on the ground that no conspiracy between the prisoner and Weaver had been shown; second, because in no event would the declarations of Weaver, in the absence of the prisoner and after the transaction and merely reciting theoccurrences, be admissible as evidence against the prisoner." The (71) court was of opinion "that the declarations of Weaver were admissible as confirmatory of the witnesses White and Brown, so far as they tended to prove a conspiracy between Weaver and the prisoner." The evidence was admitted, and for this the prisoner excepts.
The exception is well founded; and it was unnecessary to notice the other points or to state the case any further.
Admit it to have been proven that there was a conspiracy between the prisoner and Weaver, by which it was agreed that the one was to steal and the other was to take the slave to Virginia and sell him. The evidence of such a conspiracy was very slight, and his Honor seems to have considered it insufficient, for he puts the admissibility of the evidence on the ground that it was confirmatory of the witnesses so far as they tended to prove a conspiracy. But admit the conspiracy to have been proven, there is an actual impossibility that these declarations could have been used infurtherance of the common design, for they were made after the matter was over, and after Weaver was arrested, when it served his purpose to put the blame on the prisoner; and he was directly interested in making a statement according to which he himself could not be convicted under the statute. But apart from this peculiar circumstance, it is sufficient to say the declarations were not made in furtherance of the common design, and were, for that reason, inadmissible. This very point is decided, S. v. George,29 N.C. 321, and the decision is so well sustained by authority and upon principle as not to call for another word.
PER CURIAM. Error.
Cited: S. v. Jackson, 82 N.C. 568; S. v. Turner, 119 N.C. 848. *Page 62 
(72)